Filed 2/16/23

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re L.B., A Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN AND FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.D.,<br><br>        Defendant and Appellant. | A165001<br><br>(Contra Costa County<br> Super. Ct. No. J21-00286) |

In this dependency proceeding, L.D. (mother) appeals from jurisdictional findings and dispositional orders concluding that her son L.B. (born May 2009) was described by Welfare and Institutions Code[1] section 300, subdivision (b), adjudging him a juvenile court dependent, and placing him in the home of his father, S.B. Mother asserts on appeal that there was insufficient evidence to support jurisdictional findings under recent amendments to section 300, subdivision (b), and that any risk of physical harm to L.B. was speculative. We affirm.

_____

        [1] All section references are to the Welfare and Institutions Code unless otherwise specified.

1

# I. BACKGROUND

In June 2021, the Contra Costa County Children and Family Services Bureau (Bureau) filed a dependency petition with respect to L.B., alleging that the minor came within the provisions of section 300, subdivision (b) due to mother's failure to protect L.B. from ongoing domestic violence between mother and her long-term partner, T.Y. The petition additionally alleged jurisdiction under subdivision (g) based on mother's inability to provide support for the minor due to her hospitalization for a serious medical condition and consumption of high doses of pain medication.

In March 2021, the Bureau had received a referral alleging general neglect of L.B. and his half-siblings—seven-year-old T.Y., Jr. and four-year-old Y.Y. According to the reporting party, mother's mental state appeared to be impaired due to substance use or a mental health condition. The Bureau located and interviewed mother at John Muir Medical Center on June 8, 2021. She disclosed that, at the beginning of June, T.Y. put her in a choke hold and began choking her and hitting her in the face. The social worker observed a broken blood vessel in mother's left eye and was informed by staff that mother had bruising on her leg and a large bruise on her upper left arm. Mother stated T.Y., Jr. and Y.Y. did not witness the incident but she "strongly believe[d]" they heard it. She further explained that her older sons—L.B. and his adult brother, C.B.—had previously "seen and heard [her] being choked out and abused by [T.Y.]" She sent them to live with their father three months before this latest domestic violence incident.

According to mother, she had been together with T.Y. on and off for eight years and had moved back to California with him in October 2020, after which he had been "treating her mean." Mother felt that T.Y. wanted to kill her. Despite his continuing to beat her, mother repeatedly went back to T.Y.

because she was homeless at one point in her life, and she had no one else to help her. When interviewed, Y.Y. was aware that T.Y. "pushed mommy" and "hurt her" but stated she was not afraid of either parent. T.Y., Jr. reported that he had never seen his parents fight but he hears T.Y. hit his mother. He was afraid to go home with T.Y.

After the June 2021 incident of domestic violence, mother took T.Y., Jr. and Y.Y. to a shelter. However, mother has leukemia, she left her pain medications in the family home, and she was afraid to retrieve them. Eventually, her pain became so severe that she had to be transported by ambulance to the hospital. Mother reported she takes Dilaudid, OxyContin, and Xanax for pain, and sometimes takes more than the prescribed dosage to help her sleep. Because she was in constant pain, it was difficult for her to keep the family home clean. Mother disclosed that T.Y. had a gun in the home, but she did not want "to press the issues and get him into any trouble." She did not plan to go back to the home upon her discharge from the hospital because she needed "to protect [herself] and [her] children." T.Y., Jr. and Y.Y. were taken into protective custody. A records review showed mother had a history of arrests between 1999 and 2018, including four misdemeanor convictions in 1999–2000—one for obstructing a police officer and three for various assault crimes.

The social worker contacted C.J.—mother's cousin-in-law and a potential placement for the younger children. C.J. reported that mother struggled with methamphetamine use. She confirmed mother's leukemia and stated father had a babysitter for the children while he worked. In her opinion, T.Y, and mother were " 'just not good together.' " C.J. was concerned that if the younger children were released to T.Y., mother would attempt suicide. She had done so several times over the years. T.Y. had admitted to

3

C.J. that he had been "beating [mother] up." Mother had told C.J. on various occasions that T.Y. had tapped her phone, taken money out of her account, and stolen things from her. Given the "toxicity" of mother and T.Y., C.J. had instructed 18-year-old C.B. to call father to come get him and L.B. The two had been with their father for about three months.

T.Y. told the social worker that, when mother moved to California with her children in 2018, he stayed behind in Texas. He described mother as paranoid and stated she had struggled with drugs and alcohol over the last several years. T.Y. also acknowledged that mother had been suicidal on several occasions. Given the "tremendous difficulty" mother was facing, T.Y. had traveled to California at least three times to check on the family. Mother and T.Y. rekindled their romantic relationship at one point, and mother and the children returned to Texas. While there, mother assaulted T.Y. with a knife, resulting in a cut on his hand and an open child welfare case in Texas. T.Y. admitted to engaging in four or five domestic violence incidents with mother where he had called the police.

T.Y. was self-employed in construction/tile work. About three months before child welfare's involvement, father quit his other job in order to find an appropriate babysitter because mother "was leaving for weeks at a time." During this timeframe, mother was threatening suicide and her substance abuse was out of control, so T.Y. sent C.B. and L.B. to live with their father. According to T.Y., mother had been offered space in a stem cell program to treat her leukemia but was hesitant because the process might compromise her immune system and she was abusing drugs and alcohol. T.Y. stated he was "no longer sure of [mother's] mental capacity." He reported he primarily cared for the children, explaining that " 'although [mother] is a beautiful person, she is not a good parent.' "

4

Father confirmed that L.B. was in his care. He stated there was a formal custody arrangement through family court which allowed him to have L.B. for the summer and mother to have custody during the school year. However, father had removed L.B. from mother approximately one month early because "her household was unmanageable." In particular, he had concerns about the domestic violence he witnessed in mother's household. Further, this was not the first time father had removed L.B. from mother's care. In 2018, mother was staying at a "trap house" and had made a suicide attempt. Father found L.B. dirty, hungry, and with insufficient clothes. Once he was in father's care with enough food to eat, L.B. outgrew three sets of clothing. Father expressed a desire to keep L.B. indefinitely. He had two felony drug convictions, one in 1996 and the other in 2000.

Due to mother's history of domestic violence, possible substance abuse, potential unaddressed mental health issues, and questions regarding medical management of her serious health condition, the Bureau recommended that L.B. be detained from mother and left in the care of father. L.B. was formally detained with father at the detention hearing on June 15, 2021. Mother was offered supervised visitation with L.B. a minimum of twice per month. Following a number of continuances, mother's counsel was relieved and new counsel was appointed after an October 2021 *Marsden*[2] hearing.

In advance of the contested jurisdictional and dispositional hearing, the Bureau filed a report disclosing that, while they have been separated since 2009, mother and father remained married so that mother could maintain access to better health insurance. When mother and the children returned from Texas, they lived with the maternal grandmother for about a year. However, the level of domestic violence between mother and T.Y. was too

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118.

5

much for the maternal grandmother, and she asked them to leave. Despite all of the information received, as of the time the social worker prepared the report, mother was denying domestic violence in her relationship with T.Y., claiming she had no mental health issues, and denying use of any non-prescribed drugs. She variously reported that her leukemia was both "under control" and "end stage." She declined to participate in a psychosocial interview.

According to school staff, L.B.'s prior school attendance had been poor because " 'his mother never brought him to school.' " Father and his fiancée worked with L.B. over the summer and were able to help him catch up. Mother had not been in contact with L.B. since he left her home; nor had she addressed any of the concerns underlying these proceedings.

Pursuant to a March 2022 supplemental report, mother asserted she had started services and had a job interview but declined to sign releases so her participation in services could be verified without speaking with her attorney. Mother had recently relocated to Sacramento County and was reportedly living with friends. Father stated that phone contact between L.B. and mother had been going well. Mother declined to provide any details regarding her August 2021 arrest and detention to the social worker.[3]

The contested jurisdictional and dispositional hearing was finally held on March 7, 2022. After admission of the relevant reports into evidence and brief testimony from two social workers, mother took the stand. She testified

---

[3] According to the related police report, the victim of the assault had a brain bleed after being hit with an aluminum bat. The victim reported he had been sitting on the couch at a friend's house with a 40-year-old black woman he knew as "L." He apparently lost consciousness, and, when he woke up, he was told by a friend that L. was responsible for his injury. After being *Mirandized*, mother stated she believed the victim was going to hurt her. She was arrested for assault with a deadly weapon.

that her current arrangement with father was that L.B. "could be where he would like to be." However, when she got back on her feet, they could split time with L.B. Mother acknowledged that, under the formal custody agreement, she had the right to have L.B. in her home at that time and for some holidays. She denied telling a social worker that L.B. had previously seen domestic violence between her and T.Y. She stated she was on the waiting list for a domestic violence program. She did not have a current restraining order against T.Y. With respect to the alleged assault for which she had recently been arrested, mother initially claimed the account in the police report was false, but, when pressed, stated she did not want to discuss the matter further.

After argument, the juvenile court turned first to jurisdiction, sustaining an amended subdivision (b) allegation which provided: "[M]other is unable to protect the child from ongoing domestic violence with the father of the child's half-siblings, [T.Y.], in that [] mother has engaged in at least five incidents of domestic violence with [T.Y.], at least one of which occurred in the child's presence."[4] In doing so, the court noted that the record supported a "history here of serious domestic violence incidents." It found mother's version of the acts precipitating L.B. and C.B.'s most recent removal to father's home not credible. And it concluded that mother presented an ongoing risk to L.B. given her domestic violence history; her propensity to engage in violent acts, including the baseball-bat incident that she chose not to rebut on the stand; and her failure to take any preventative steps to allay the court's concerns "should she elect to reel [L.B.] back and exercise her power of physical custody that she currently ha[d] in this case." The juvenile court additionally found T.Y. to be a violent person and concluded mother's

---

[4] The remainder of the allegations in the petition were dismissed.

contact with T.Y. had been recent enough to raise concerns that her pattern with him would continue.

Having declared L.B. to be a child described by subdivision (b) of section 300, the juvenile court proceeded to disposition, declaring L.B. a juvenile court dependent and removing him from mother's physical custody. The court granted sole physical custody of L.B. to father, joint legal custody to both parents, and supervised visitation for mother. Thereafter, finding that L.B. was no longer a person described by section 300, the court vacated the dependency and dismissed the petition, with a custody order pursuant to section 361.2 to be filed in family court.

This timely appeal followed.

## II. DISCUSSION

### A. *Legal Framework*

Dependency jurisdiction may be asserted under subdivision (b) of section 300 if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of . . . [¶] "the failure or inability of the child's parent . . . to adequately supervise or protect the child" or the "willful or negligent failure" of the parent to protect the child from the conduct of a custodian with whom the child has been left. (§ 300, subd. (b)(1)(A) & (B).) "The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843; see *In re T.V.* (2013) 217 Cal.App.4th 126, 133 (*T.V.*) ["[t]he focus of section 300 is on averting harm to the child"].) It is well settled that physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b)(1) of section 300 where there is evidence that the domestic violence has placed the child *at risk* of physical harm and the

8

violence is ongoing or likely to recur. (*In re M.W.* (2015) 238 Cal.App.4th 1444, 1453–1454; *In re R.C.* (2012) 210 Cal.App.4th 930, 941–942; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 717, disapproved on another ground in *In re D.P.* (2023) 14 Cal.5th 266, 278; *In re Heather A.* (1996) 52 Cal.App.4th 183, 194 ["It is clear to this court that domestic violence in the same household where children are living *is* neglect; it is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it. Such neglect *causes* the risk."], disapproved on another ground in *In re R.T.* (2017) 3 Cal.5th 622, 628–629 (*R.T.*).)

The relevant inquiry under section 300, subdivision (b)(1), is whether circumstances at the time of the jurisdictional hearing " 'subject the minor to the defined risk of harm.' " (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.) "The court may consider past events in deciding whether a child currently needs the court's protection." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383 (*Kadence P.*); see *T.V.*, at p. 133.) Indeed, in a domestic violence situation, past violence is highly probative of the risk that violence may recur. (See *In re E.B.* (2010) 184 Cal.App.4th 568, 576 (*E.B.*) [" 'Past violent behavior in a relationship is "the best predictor of future violence." Studies demonstrate that once violence occurs in a relationship, the use of force will reoccur in 63% of these relationships.' "], disapproved on another ground in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7; *In re John M.* (2013) 217 Cal.App.4th 410, 419 [concluding even a single incident of domestic violence may be sufficient to support a jurisdictional finding under section 300, subdivision (b)], disapproved on another ground in *R.T.*, *supra,* 3 Cal.5th at pp. 628–629.) To establish a defined risk of harm at the time of the hearing, there "must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re D.L.* (2018) 22 Cal.App.5th 1142, 1146 (*D.L.*).)

A jurisdictional finding that the minor is a person described in section 300 must be made by at least a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.) "We review the jurisdictional findings for substantial evidence. [Citation.] We consider the entire record, drawing all reasonable inferences in support of the juvenile court's findings and affirming the order even if other evidence supports a different finding. [Citation.] We do not consider the credibility of witnesses or reweigh the evidence." (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137–138.) "The parent has the burden on appeal of showing there is insufficient evidence to support the juvenile court's order." (*Id.* at p. 138.)

However, to the extent statutory interpretation is involved, our review is de novo. (*People v. Tirado* (2022) 12 Cal.5th 688, 694.) As we recently reiterated: " ' "The fundamental rule of statutory construction is that a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law.' " [Citations.] 'Because the statutory language is generally the most reliable indicator of legislative intent, we first examine the words themselves, giving them their usual and ordinary meaning and construing them in context.' [Citation.] 'The statute's plain meaning controls the court's interpretation unless its words are ambiguous.' [Citation.]" (*Pacific Fertility Cases* (2022) 78 Cal.App.5th 568, 575–576 (*Pacific Fertility*), review granted Aug. 17, 2022, S275134.)

"When ' "the language permits more than one reasonable interpretation, . . . the court looks 'to a variety of extrinsic aids, including the ostensible objects to be achieved, the evils to be remedied, the legislative history, public policy, contemporaneous administrative construction, and the statutory scheme of which the statute is a part.' " ' [Citation.]" (*Pacific Fertility, supra*, 78 Cal.App.5th at p. 576.) Fundamentally, however,

" ' "statutes must be construed so as to give a reasonable and common-sense construction consistent with the apparent purpose and intention of the lawmakers—a construction that is practical rather than technical[] and will lead to wise policy rather than mischief or absurdity." ' [Citation.]" (*Ibid.*)

### B.    *Impact of Revisions to Subdivision (b)*

Effective January 1, 2022, subdivision (b)(1) of section 300 was amended to include the following language:  "A child shall not be found to be a person described by this subdivision solely due to the failure of the child's parent or alleged parent to seek court orders for custody of the child.  (Stats. 2021, ch. 98, § 1 (Assem. Bill 841); former § 300, subd. (b)(1); see also § 300, subd. (b)(2)(B).)  Mother initially argues that, under this new provision, jurisdiction was improper here because it was only necessary due to the failure of the parents to seek formal custody orders to protect L.B.  Mother misapprehends both the statutory language and the related legislative history.[5]

Looking first to the plain language of the statute, we note that the provision only applies when the child is described by section 300, subdivision (b) *solely due* to the failure of a parent to seek custody orders.  (§ 300, subd. (b)(2)(B).)  Arguably, whenever custody orders would ameliorate risk, it could be claimed that dependency jurisdiction was based solely on the failure to

---

[5] Mother's unopposed request for judicial notice of the legislative history of Assembly Bill 841, filed on July 6, 2022, is granted.  (See *People v. Synder* (2000) 22 Cal.4th 304, 315, fn.5; *Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 31-37; see also Evid. Code, §§ 452, subd. (c), 459, subd. (a).)  On our own motion, we also take judicial notice of the legislative history of Senate Bill No. 1085 (2021-2022 Reg. Sess.) (Sen. Bill 1085).  (Evid. Code, § 452, subd. (c); *Kern v. County of Imperial* (1990) 226 Cal.App.3d 391, 400, fn.8 [appellate court may take judicial notice of legislative history materials on own motion].)

obtain such orders.  However, we believe this reading of the statutory language sweeps too broadly, encompassing numerous cases (such as this one) where dependency jurisdiction is necessary to protect a child.  Instead, it would appear that the provision means what it says:  Where other allegations are made pursuant to section 300, subdivision (b)—such as the assertions of extensive domestic violence present here—the new provision is simply inapplicable.  This construction is borne out when section 300, subdivision (b) is read as a whole.

After the custody-order provision at issue was added effective January 1, 2022, subdivision (b) was again amended by the Legislature, this time to add a similar provision related to indigency, effective January 1, 2023. (Stats. 2022, ch. 832, § 1 (Senate Bill 1085); see § 300, subd. (b)(2)(C).) Senate Bill 1085 also grouped these two provisions together with an existing, third provision involving homelessness.  Thus, in its current form, section 300, subd. (b)(2) provides:  "A child shall not be found to be a person described by this subdivision solely due to any of the following:  [¶]  (A) Homelessness or the lack of an emergency shelter for the family.  [¶]  (B)  The failure of the child's parent or alleged parent to seek court orders for custody of the child.  [¶]  (C)  Indigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare."

By grouping these three exclusions from jurisdiction together, the Legislature made even clearer that they are all meant to operate in a similar fashion.  And both homelessness and indigence may be a factor considered under section 300, subdivision (b), so long as neither is the only factor.  For example, substance abuse or mental health issues that lead to homelessness or indigence, putting children at risk, could potentially support jurisdiction

under subdivision (b) of section 300.  Analogously, a failure to obtain custody orders to protect a child from one parent whose behaviors place that child at risk is one factor that may be considered by the juvenile court in finding jurisdiction under subdivision (b), but it may not be the only factor and, by itself, would likely be insufficient to support removal of the child from the other parent.

Contrary to mother's assertions, the legislative history for both Assembly Bill 841 and Senate Bill 1085 supports this interpretation.  The Assembly Committee on Human Services quoted the author of Assembly Bill 841 as follows:  " 'A parent is not unfit *solely because* they are not litigious, lacking the money or sophistication or time to seek legal redress of family issues in court actions.  Likewise, a parent is not unfit *solely because* they try to work out issues with another parent informally and collaboratively, without seeking formal court orders.  Even so, *in rare but not uncommon cases, child welfare agencies will allege that a parent has failed to protect a child under WIC 300 solely on the single ground that the parent did not initiate child-protecting litigation against another parent.*  Such allegations penalize and seek to rupture families based on either their poverty, lack of legal sophistication, or efforts informally to resolve family issues.  *Inspired by current law's treatment of lack of emergency shelter, which, too, cannot all by itself be the basis of a Section 300 allegation* [citation], [this bill] *narrowly* addresses this problem simply by saying that *an alleged failure to seek protection for a child by initiating litigation, while permitted as one of the factors in weighing whether a parent has adequately protected a child, cannot all by itself serve as the basis of a WIC section 300 allegation.'* "  (Assem. Com. on Human Services, Analysis of Assem. Bill No. 841 (2021-2022 Reg. Sess.) as amended Mar. 23, 2021, p. 3, italics added; see also Assem. Com. on

13

Judiciary, Analysis of Assem. Bill No. 841 (2021-2022 Reg. Sess.) as amended Mar. 23, 2021, p. 4 (Judiciary Analysis) ["Simply being poor and homeless, in and of itself, does not allow a juvenile court to take dependency jurisdiction over the child. However, if there are additional reasons, being homeless could be part of the reason that a child is made a dependent of the juvenile court."].)

The illustrative case presented to the Legislature underscores this point. In that case, the father failed to seek appropriate custody orders to obtain custody of the children and prevent mother from taking them out of state where they were exposed to unsafe circumstances, " 'even though [the father] knew or reasonably should have known that the mother was using illicit drugs and had mental health issues.' " (Judiciary Analysis, *supra*, p. 4.) Of importance in that scenario, "the allegation [was] not that the father knew that the mother was headed to another state. Nor [was] it alleged that the father knew what was in store for his children in the other state was dangerous. Nor [was] it alleged the father actually and subjectively knew of the mother's drug use. [Nevertheless], the county successfully pressed the allegation that the father was legally abusive or neglectful only because he did not initiate litigation against the mother on her drug use—even though he may not actually have known of the drug use." (*Ibid.*)

Thus, as the Judiciary Committee summarized: "A child can be brought into the juvenile court for a parent's failure to protect the child from harm, including harm caused by the other parent. However, failure to bring an action in family court to establish custody of a child should not, by itself, be enough to bring a child into the child welfare system or have the child removed from the parent. In the example above, the child may very likely still be brought within the jurisdiction of the juvenile court and taken away

14

from the mother, but the father should not need to do anything more to gain (or regain) custody of the child. If, however, the father knew that the child was in danger by being with the mother and took no action to protect the child—which could include seeking a custody order for the child—the juvenile court could find that the father posed a risk of harm to the child." (Judiciary Analysis, *supra*, p. 4.)

Finally, the legislative history for Senate Bill 1085 is in accord. As stated above, that legislation amended subdivision (b) of section 300 to provide that a child may not be found to be a person described by that subdivision *solely due to* "[i]ndigence or other conditions of financial difficulty, including, but not limited to, poverty, the inability to provide or obtain clothing, home or property repair, or childcare." (§ 300, subd. (b)(2)(C).) Senate Bill 1085 makes clear that the three exceptions to jurisdiction under subdivision (b) are meant to be similarly construed: "Existing law prohibits a child from being found to be within the jurisdiction of the juvenile court [under subdivision (b)] solely due to the lack of an emergency shelter for the family or the failure of the child's parent or alleged parent to seek court orders for custody of the child. [¶] This bill would also prohibit a child from being found to be within the jurisdiction of the juvenile court [under subdivision (b)] solely due to indigence or other conditions of financial difficulty." (Legis. Counsel's Dig., Sen. Bill No. 1085 (2021-2022 Reg. Sess.) Stats. 2022, Summary Dig., p. 94; see also Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1085 (2021-2022 Reg. Sess.) as amended June 9, 2022, pp. 5–6 ["The author, sponsor, and supporters . . . believe it is important to clarify that conditions of poverty *alone* do not give a dependency court jurisdiction over a child. This bill builds on the existing exception to juvenile court jurisdiction solely because a family lacks emergency shelter

15

and provides that *simply being homeless, alone, is not a basis for dependency court jurisdiction of a child.*"].)[6]

In sum, subdivision (b)(2)(B) of section 300 has no relevance to this case, where the lack of appropriate custody orders was only one of many factors placing L.B. at risk of harm pursuant to section 300, subdivision (b).

## C.    *Substantial Evidence Supports the Jurisdictional Findings*

Mother argues in the alternative that, even if section 300, subdivision (b)(2)(B) is inapplicable on these facts, there is still a lack of substantial evidence that L.B. would be at substantial risk of serious harm absent jurisdiction under subdivision (b) of section 300. Specifically, she asserts that it was "impermissibly speculative" to base jurisdiction on "the possibility that L.B. might be injured from domestic violence if mother again became a victim of domestic violence or engaged in domestic violence, and father released L.B. to mother . . . [or] mother sought custody from father when she was in a domestic violence relationship." We disagree.

While father and/or mother may have acted to protect L.B. from the June 2021 incident of domestic violence between mother and T.Y., the relevant inquiry under section 300, subdivision (b)(1), as stated above, is whether circumstances at the time of the jurisdictional hearing " 'subject the minor to the defined risk of harm.' " (*T.V.*, *supra*, 217 Cal.App.4th at p. 133.)

---

[6] Senate Bill 1085 also added subdivision (b) to section 300.2 to codify the following legislative intent: "It is the intent of the Legislature that families should not be subject to the jurisdiction of the juvenile court nor should children be separated from their parents based on conditions of financial difficulty . . . . Consistent with existing law, no family should be subject to the jurisdiction of the juvenile court nor should children be separated from their parents based on conditions of financial difficulty unless there is *willful or negligent action or failure to act and a nexus to harm such that the child has suffered or there is a substantial risk the child will suffer serious physical harm or illness.*" (Italics added.)

Moreover, "[t]he court may consider past events in deciding whether a child currently needs the court's protection" (*Kadence P.*, *supra*, 241 Cal.App.4th at p. 1383), but there "must be some reason beyond mere speculation to believe the alleged conduct will recur" (*D.L.*, *supra*, 22 Cal.App.5th at p. 1146; see also *In re J.N.* (2021) 62 Cal.App.5th 767, 775 [child welfare "must establish a nexus between the parent's past conduct and the current risk of harm"]).  In the domestic violence context, past violence is highly probative of the risk that violence may recur.  (See *E.B.*, *supra*, 184 Cal.App.4th at p. 576.)

Here, we have no difficulty concluding that L.B. was subject to a defined risk of harm at the time of the jurisdictional hearing.  There was a significant history of past domestic violence in this case pursuant to statements from mother, T.Y., the maternal grandmother, and C.J.  Indeed, father stated he viewed domestic violence in mother's household when he decided to remove L.B. before the June 2021 incident.  Further, there was a gun in T.Y.'s home, and mother stated she always went back to him because she had been homeless before and she had no one else to help her.  In addition, there was also significant evidence of mother's own assaultive behavior—in her criminal history, assault of T.Y. in Texas, and recent arrest for assault with a deadly weapon.[7]  Thus, the risk to L.B. did not necessarily depend on mother reuniting with T.Y.  Finally, mother subsequently denied any domestic violence, failed to maintain the temporary restraining order

_____

[7] Mother argues that the juvenile court erred by relying on her refusal to testify regarding her recent assault arrest in finding jurisdiction, citing self-incrimination concerns.  However, even were we to assume that the juvenile court erred by commenting on mother's failure to explain the incident (but see § 355.1, subd. (f)), the police report provides substantial evidence that the assault actually occurred, including mother's own admission that she believed the victim was going to hurt her.

against T.Y., and had not provided evidence of engagement in any services addressed at ameliorating the juvenile court's concerns.

Nor does it matter that mother had not attempted to change the custody arrangement between April 2021 when L.B. moved to father's home and the March 2022 jurisdictional hearing. As stated above, the juvenile court properly considered, as one factor, the fact that the current custody orders permitted mother to remove L.B. from father's custody during the school year and for certain holidays. Thus, the risk to L.B. remained regardless of mother's failure to exercise her custody rights while these proceedings were pending. Indeed, we note in this regard that father had previously removed L.B. from mother in 2018 due to significant neglect and nevertheless allowed him later to spend the bulk of his time in mother's care. Under such circumstances, the juvenile court acted appropriately by taking jurisdiction based on the defined risk of harm to L.B. and then dismissing dependency after changing the relevant custody orders to ameliorate that risk of harm.

### III. DISPOSITION

The jurisdictional findings and dispositional orders are affirmed.

SWOPE, J.*

WE CONCUR:


HUMES, P. J.


MARGULIES, J.


A165001P


---

* Judge of the San Mateo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Contra Costa County Superior Court

Hon. Wade M. Rhyne

Counsel:

Seth F. Gorman under appointment by the Court of Appeal for Defendant and Appellant.

Mary Ann Mcnett-Mason, County Counsel, Noel Plummer, Deputy County Counsel, for Plaintiff and Respondent.